UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

KIEFER DERIK OLGER,

                         Petitioner,                              Case No. 1:21-cv-619

v.                                                                Honorable Jane M. Beckering

CONNIE HORTON,

                         Respondent.

_____/

## OPINION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Kiefer Derik Olger is incarcerated with the Michigan Department of Corrections at the Kinross Correctional Facility (KCF) in Kincheloe, Chippewa County, Michigan. On November 23, 2015, following a four-day jury trial in the Ingham County Circuit Court, Petitioner was convicted of two counts of delivery of a controlled substance, less than 50 grams, in violation of MICH. COMP. LAWS § 333.7401(2)(a)(iv), and one count of delivery of a controlled substance causing death, in violation of MICH. COMP. LAWS § 750.317a. On January 6, 2016, the court sentenced Petitioner as a second habitual offender, MICH. COMP. LAWS § 769.10, to prison terms of 4 to 30 years for one count of delivery, 5 to 30 years for the other count of delivery, and 18 years, 4 months to 33 years, 4 months for delivery causing death. All of Petitioner's sentences were ordered to run concurrently. (J. of Sentence, ECF No. 9-15, PageID.988.)

On July 21, 2021, Petitioner, who is represented by counsel in this action, filed his habeas corpus petition raising eight grounds for relief, as follows:

I.      There was insufficient evidence that Petitioner delivered the heroin that caused Jonathan Singer's death, in violation of the Due Process Clause of the Fourteenth Amendment.

II.     Trial counsel was constitutionally ineffective for failing to (A) prepare for trial, and (B) object to judicial bias.

III.    The trial judge displayed bias or the appearance of bias against Petitioner by demeaning his attorney and expressing skepticism about the credibility of Petitioner's trial testimony, in violation of the Due Process Clause of the Fourteenth Amendment.

IV.     Petitioner's convictions for both delivery of a controlled substance causing death, under MICH. COMP. LAWS § 750.317a, and delivery of less than 50 grams of a controlled substance, under MICH. COMP. LAWS § 333.7401(2)(a)(iv), violate the Double Jeopardy Clause.

V.      The prosecutor mischaracterized Deputy William Lo's testimony on a material issue, in violation of the Due Process Clause of the Fourteenth Amendment.

VI.     Trial counsel was constitutionally ineffective for (A) failing to object to the prosecutor's mischaracterization of Deputy Lo's testimony, and (B) failing to impeach Police Chief Bruce Ferguson with false statements he made in his affidavit for search warrant.

VII.    The state trial court imposed a harsher sentence based on Petitioner's exercise of his right to testify and admit guilt on one of the charges, in violation of the Due Process Clause of the Fourteenth Amendment.

VIII.   Appellate counsel was constitutionally ineffective for failing to raise habeas claims V–VII on direct appeal.

(Pet., ECF No. 1, PageID.5–11.) Respondent asserts that Petitioner's grounds for relief are

meritless.[1] (ECF No. 8.) For the following reasons, the Court concludes that Petitioner has failed

---

[1] Respondent also contends that Petitioner's third, fifth, sixth, and seventh grounds for relief are procedurally defaulted. (ECF No. 8.) Respondent does recognize, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. MaCauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the

to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

**Discussion**

## I.     Factual Allegations

The court of appeals' opinion regarding the convictions at issue does not describe the facts underlying Petitioner's convictions, only noting that they arise "from the death of Jonathan Singer, who overdosed on heroin on September 12, 2013." *People v. Olger*, Nos. 331705, 331876, 2017 WL 2199896, at *1 (Mich. Ct. App. June 27, 2017). The Court supplements this fact with relevant information from the trial court record below.

On September 11, 2013, Singer, Austen Connelly, and Jesse Trim decided to go to the Whiskey Barrel in East Lansing, Michigan. (Trial Tr. II, ECF No. 9-9, PageID.742.) On the way, they stopped at Petitioner's house. (*Id.*) Jesse Trim testified that he had purchased drugs from Petitioner in the past. (*Id.*) He testified that Petitioner had sold him ecstasy and mushrooms, and had also offered heroin, which Petitioner sold packaged in "lottery tickets." (*Id.*, PageID.743.) On September 11, 2013, all three individuals purchased ecstasy, or "molly," from Petitioner. (*Id.*, PageID.730.) Trim also saw Petitioner and Singer go into an adjoining room. (*Id.*, PageID.744.) When they left Petitioner's house, Trim saw Petitioner and Singer shaking hands. (*Id.*)

Singer, Connelly, and Trim then went to the Whiskey Barrel and waited in line for about 10 minutes before Trim realized he did not have his driver's license. (*Id.*) Trim and Singer, along with Trim's girlfriend, Lindsey O'Leary, left, and Trim drove Singer's car because Singer had

---

merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix*, 520 U.S. at 525; *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into exhaustion and procedural default, the Court finds that judicial economy counsels that the better approach is to go directly to a discussion of the merits of Petitioner's claims.

already been drinking. (*Id.*, PageID.719.) The search for Trim's license was unsuccessful, and they returned to the Whiskey Barrel. (*Id.*, PageID.745.)

Shortly after, Singer and Trim decided to go back to Trim's house. (*Id.*) On the way, they stopped at a gas station. (*Id.*) Right before they stopped, Singer had told Trim that he had heroin. (*Id.*) Singer went into the gas station bathroom, and Trim stayed outside to smoke a cigarette. (*Id.*) Trim testified that Singer was inside for a "good 10 minutes." (*Id.*) Trim went inside to the bathroom and passed Singer on the way. (*Id.*) Trim testified that Singer did not even recognize him, and that Singer "was like a zombie" with his eyes shut. (*Id.*, PageID.745–746.) Trim found "two empty lottery tickets" and a powder that he believed was heroin inside the bathroom. (*Id.*, PageID.745.) He took the lottery tickets back to the car and confronted Singer. (*Id.*)

Singer and Trim then returned to Trim's house. (*Id.*, PageID.746.) As soon as they got inside, Singer told Trim that he had forgotten his phone in the car. (*Id.*) When Singer came back from the car, "he was a lot more messed up." (*Id.*) Trim testified that Singer "could barely pronounce his words" and "wasn't walking nearly the same." (*Id.*, PageID.747.) Trim and Singer sat down and talked, but Singer was "falling out of consciousness." (*Id.*)

Meanwhile, O'Leary called Trim, who told her what was going on with Singer. (*Id.*, PageID.720, 747.) Trim told O'Leary that he "thought John was overdosing." (*Id.*, PageID.720.) Trim panicked and made other calls, including one to Petitioner "to ask what to do." (*Id.*, PageID.748.) Trim thought about calling the police, but was persuaded not to by Connelly, who had returned from the bar by that time. (*Id.*, PageID.749.) Connelly testified that he thought Singer had recovered and was breathing fine after he and Trim placed a warm towel on Singer's head and performed CPR. (*Id.*, PageID.733.) Eventually, Trim and Connelly both fell asleep. (*Id.*, PageID.734, 749.)

The next morning, Trim woke up early for a random drug test for his probation. (*Id.*, PageID.749.) He then went to class. (*Id.*) When Trim returned home, he was unable to wake up both Connelly and Singer. (*Id.*, PageID.750.) Connelly eventually woke up. (*Id.*) When Trim realized Singer would not wake up, he ran downstairs to find his father. (*Id.*) Charles Trim testified that his son said, "I think John is choking or something. He can't breathe." (Trial Tr. I, ECF No. 9-8, PageID.708.) Charles Trim went upstairs and found that Singer was unresponsive. (*Id.*) He was unable to locate Singer's pulse and began CPR. (*Id.*) Singer was sitting on the floor, his back against the couch, and was "pale" and "cold." (*Id.*, PageID.708–709.) Charles Trim told the others to call 911. (*Id.*, PageID.708.)

Singer was pronounced dead at 10:53 a.m. on September 12, 2013. (*Id.*, PageID.696.) Dr. Patrick Cho, a deputy medical examiner, testified that there were "very high levels of morphine" in Singer's blood. (Trial Tr. III, ECF No. 9-10, PageID.798.) Dr. Cho testified that the presence of morphine in Singer's urine was indicative of heroin use. (*Id.*, PageID.799.) Dr. Cho testified that although numerous drugs were found in Singer's system, the morphine was the primary cause of death. (*Id.*)

In the weeks that followed Singer's death, Connelly and Trim received communications from Petitioner. Connelly testified that Petitioner would call him "four or five times a day for, like, a week." (Trial Tr. II, ECF No. 9-9, PageID.737.) He also received text messages from Petitioner. (*Id.*) Connelly did not answer any of the texts or calls. (*Id.*) Trim testified that he remembered his conversation with Petitioner "like it was yesterday," and that it was "weird that [Petitioner] called" because Trim only knew of Petitioner as a "drug dealer." (*Id*, PageID.751.) Petitioner asked Trim about the investigation into Singer's death and kept asking if Connelly was going to tell. (*Id.*) Petitioner sounded worried and asked if Trim and Connelly had been talking to the police. (*Id.*)

5

About a month later, on November 12, 2013, Deputy William Lo, who was working in an undercover capacity with the Tri County Metro Narcotics team, met Petitioner to purchase heroin from him. (Trial Tr. III, ECF No. 9-10, PageID.787.) Lo told Petitioner that he had $80.00 to spend and was looking to buy heroin. (*Id.*, PageID.788.) Petitioner responded that he "could try to get a hold of somebody but he needed a telephone because his wasn't currently working." (*Id.*) Lo and Petitioner then drove to meet a man referred to as "Tone." (*Id.*) Lo gave the money to Petitioner, who made contact with Tone. (*Id.*, PageID.789.) Lo remained in the car during the transaction. (*Id.*) Petitioner then returned with "a folded piece of cut lottery paper" containing heroin. (*Id.*)

Lo testified that before the purchase, he and Petitioner had made small talk during the drive. During this conversation, Petitioner mentioned Singer's death. Lo testified that Petitioner began discussing a person named "John" who had overdosed. (*Id.*, PageID.791.) Lo was aware of the incident because he had been briefed by Chief Ferguson. (*Id.*) Petitioner admitted that he "dealt with John that evening that John actually OD'd." (*Id.*) Petitioner admitted to selling drugs, including heroin, to John and his friends. (*Id.*, PageID.792.) Petitioner also mentioned another individual, Jesse, who was with John that night. (*Id.*) Petitioner also told Lo that Jesse had called him, panicking, and told him that John was overdosing. (*Id.*) Petitioner had told Jesse not to call him. (*Id.*)

After a little over two hours of deliberating, the jury reached a guilty verdict on November 23, 2015. (Trial Tr. IV, ECF No. 9-11, PageID.845.) Petitioner appeared before the trial court for sentencing on January 6, 2016. (ECF No. 9-12.)

Petitioner, with the assistance of counsel, directly appealed his convictions and sentences, raising the first four grounds for relief set forth above. The court of appeals rejected all of Petitioner's arguments and affirmed his convictions and sentences. *See Olger*, 2017 WL 2799896,

at *1. The Michigan Supreme Court denied leave to appeal on September 28, 2018. (ECF No. 9-17, PageID.1254.)

Petitioner then filed a *pro se* motion for relief from judgment pursuant to Michigan Court Rule 6.500, raising the last four grounds for relief set forth above. (ECF No. 9-13, PageID.855–909.) The trial court denied his motion in an opinion and order issued on October 23, 2019. (ECF No. 9-14.) Petitioner applied for leave to appeal that decision in the Michigan Court of Appeals and the Michigan Supreme Court. Those courts denied leave by orders entered on July 1, 2020, and February 1, 2021, respectively. (ECF No. 9-16, PageID.1118; ECF No. 9-18, PageID.1257.) This § 2254 petition followed.

## II.    AEDPA Standard

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).  This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

7

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

### III.     Discussion

#### A.     Ground I—Sufficiency of the Evidence

Petitioner first contends that the prosecution presented insufficient evidence that he delivered the heroin that caused Singer's death. (ECF No. 1, PageID.5.) Petitioner argues that the only evidence that he delivered the heroin was his alleged "confession" to Deputy Lo. (*Id.*, PageID.6.) He states that Trim and Connelly, as well as Petitioner himself, testified only to purchasing and selling ecstasy on the night in question. (*Id.*)

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court announced the following standard for resolving sufficiency of the evidence claims: the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Witness credibility remains the province of the jury, *see Herrera v. Collins*, 506 U.S. 390, 401–02 (1993), and an attack on witness credibility constitutes a challenge to the quality, but not the sufficiency of the government's evidence. *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). The habeas court need only examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196–97 (6th Cir. 1988).

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA."

*Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

In resolving Petitioner's sufficiency of the evidence challenge, the Michigan Court of Appeals stated with respect to the standard of review:

> "Claims of insufficient evidence are reviewed de novo." *People v. Kloosterman*, 296 Mich. App. 636, 639; 823 N.W.2d 134 (2012). A reviewing court "must view the evidence in the light most favorable to the prosecution and determine whether the evidence was sufficient to allow any rational trier of fact to find guilt beyond a reasonable doubt." *Id.* "All conflicts in the evidence must be resolved in favor of the prosecution." *People v. Kanaan*, 278 Mich. App. 594, 619; 751 N.W.2d 57 (2008). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v. Kosik*, 303 Mich. App. 146, 151; 841 N.W.2d 906 (2013).

*Olger*, 2017 WL 2799896, at *1. Although the appellate court cited state court authority for the standard, the standard applied is identical to *Jackson*. Moreover, if one looks to *Kloosterman* and *Kanaan* and the cases cited therein in support of the standard, eventually the source of the standard is identified as *Jackson*. *See People v. Wolfe*, 489 N.W.2d 748, 751 (Mich. 1992). Thus, there is no question that the court of appeals applied the correct standard.

After stating the appropriate standard, the court of appeals followed it. The court of appeals identified the elements of delivery of a controlled substance causing death, focusing on the fact that it is a general intent crime, and that the defendant "need only intend 'the *delivery* of a schedule 1 or 2 controlled substance.'" *Olger*, 2017 WL 2799896, at *1 (quoting *People v. Plunkett*, 780 N.W.2d 280 (Mich. 2010)). The court then reviewed the record evidence in a light most favorable to the prosecution, stating:

> Defendant does not dispute that Singer died as a result of consuming heroin; rather, he argues that the evidence was insufficient to show that he provided the heroin that caused Singer's death. The prosecution was not required to prove that defendant delivered heroin directly to Singer. A person violates MCL 750.317a if he or she delivers heroin "to another person . . . that is consumed by that person *or any other*

11

*person* and that causes the death of that person . . . ." (Emphasis added.) Deputy William Lo testified that, during a controlled buy in November 2013, defendant mentioned a "John" "that he knew that had OD'd on heroin." According to Lo, defendant told him that the night of the overdose, "he dealt with John and [another man named] Jesse as part of a group of kids from the Dewitt area." Lo said that defendant told him "that he had sold them heroin and some other—other narcotics." Lo's testimony alone was sufficient to support a finding that defendant delivered heroin "to another person" on September 11, 2013.

Further, Jesse Trim, Austen Connelly, and defendant testified that Trim went to defendant's home on the evening of September 11, 2013, to purchase "Molly," also known as ecstasy. Text messages from Trim's cell phone corroborate that a transaction occurred. Although the transaction purportedly concerned "Molly," "a jury is free to believe or disbelieve, in whole or in part, any of the evidence presented." *People v. Perry*, 460 Mich. 55, 63; 594 N.W.2d 477 (1999). Trim further agreed that, while he and Singer were in defendant's home, defendant and Singer went into the next room for a couple of minutes and he was unable to see Singer during that time. Trim answered affirmatively when asked if he observed "Defendant and John shake hands in any way," which he said occurred "[r]ight as we were leaving." Viewing this evidence in a light most favorable to the prosecution, a rational jury could find beyond a reasonable doubt that defendant delivered heroin to someone in the group of Trim, Connelly, and Singer while they were at his home.

Defendant argues that even if Singer received heroin from him on September 11, 2013, it is not clear that this was the heroin that caused his death. We conclude that the evidence presented at trial was sufficient to allow a rational jury to infer beyond a reasonable doubt that the heroin delivered by defendant was then consumed by Singer. First, the heroin Singer consumed before his death was packaged similarly to the heroin defendant delivered on other occasions. Trim testified that he had observed defendant sell heroin and that it "was always in lottery tickets" and was in the form of a "[d]ark powdery substance." Trim testified that on the night of Singer's death Singer entered a gas station bathroom after announcing that "he had heroin," and when Trim entered the same bathroom, he saw "two empty lottery tickets." When asked if he "notice[d] anything on or near the lottery tickets that caught your attention," Trim answered, "Powder. It was really powdery." Deputy Lo testified that when he purchased heroin from defendant during the controlled buy, defendant "provided me with a folded piece of cut lottery paper" which contained "powdered heroin." Trim also believed that Singer later went to his vehicle to consume heroin. Officer Chad Vorce testified that a search of Singer's vehicle produced "a lottery ticket or a receipt and there was a bindle with heroin residue wrapped up inside."

Cell phone records also established that Trim called defendant numerous times in the early morning hours of September 12, 2013. Singer's girlfriend, Lindsey O'Leary, testified that Trim was "freaking out" and thought Singer was overdosing

when she talked to him around that same time. O'Leary testified that she discussed calling an ambulance with Trim and added,

> [T]hey [presumably Trim and Connelly] also discussed, I think in my statement I said Keith, but I know . . . now that I know his name, Keifer. They called him because he is the one that they said had sold it. So they were calling him to figure out, I guess, what to do.

Trim remembered calling defendant that night, and when asked, "Why did you call the Defendant," Trim replied, "I am guessing it was to ask what to do. What was going on with John?" Although Singer ingested multiple substances that day, it was clear that Trim attributed Singer's dire state to heroin, as he explained, "I've never seen anyone that messed up on heroin." A rational jury could infer that Trim called defendant because he knew or believed that defendant supplied the heroin that was causing Singer's adverse reaction.

Defendant's cellphone calls and text messages to Trim and Connelly following Singer's death were also evidence of a guilty conscience. Trim testified that when he spoke to defendant after Singer's death, defendant was unusually friendly and "sounded worried." Defendant asked Trim if he was talking to the police and "really kept asking about Austen Connelly, and kept asking if he was going to tell—he was really worried about Austen, and it was extremely obvious." Connelly testified that defendant called or texted him after Singer's death "four or five times a day for, like, a week." "Evidence that a defendant made efforts to influence an adverse witness is relevant if it shows consciousness of guilt." *People v. Schaw*, 288 Mich. App. 231, 237; 791 N.W.2d 743 (2010).

Defendant argues that there was evidence that Singer may have received heroin from someone named "Jamo" or "Jamal." Trim testified that he initially told law enforcement "that I thought [Singer] got [the heroin] from Jamo," but now maintained that it "was Keifer." Officer Bruce Ferguson testified that he conducted follow-up interviews with Trim and Connelly after obtaining their original statements. When asked why he decided to conduct these interviews, Ferguson replied,

> Well, as were [sic] going through the investigation, we were obviously learning more information. By this time we had the phone records. And in the phone records we could, you know, kind of chronologically see what was going on at what time and who did what and said what.

A rational jury could have inferred that Trim was less than truthful during his initial interview and that he provided a different version of events after his phone records showed text messages with defendant on September 11, 2013, which suggested a drug transaction, and additional communications with defendant in the early morning hours of September 12, 2013.

Further, the police searched Singer's vehicle and Trim's and Singer's residences, but the only heroin found was "residue" on a lottery ticket in Singer's vehicle. Therefore, contrary to defendant's assertion on appeal, there was no evidence to suggest that Singer consumed heroin procured from different sources leading up to his death. In any event, "it is unnecessary for the prosecutor to negate every reasonable theory consistent with the defendant's innocence. It is sufficient if the prosecution proves its own theory beyond a reasonable doubt in the face of whatever contradictory evidence the defendant may provide." *People v. Carson*, 189 Mich. App. 268, 269; 471 N.W.2d 655 (1991). Viewing all of this evidence in a light most favorable to the prosecution, we conclude that a rational jury could find beyond a reasonable doubt that defendant delivered the heroin that caused Singer's death.

*Olger*, 2017 WL 2799896, at *1–3.

The Supreme Court has separated sufficient from insufficient evidence by assessing whether the finding could be based on reasoned inference or only speculation. *Coleman v. Johnson*, 566 U.S. 650, 655 (2012). And, importantly, the *Coleman* Court provided some guidance with respect to the distinction. Based on the Court's analysis, a reasonable inference is an inference that a rational factfinder could make from the facts. That is hardly an earth-shattering revelation and it is not a particularly onerous burden. The Court went so far as to say, "the only question under *Jackson* is whether [a] finding is so insupportable as to fall below the threshold of bare rationality." *Id*. at 656.

To succeed in his challenge, Petitioner cannot simply reject the identified inferences, complain that there are other equally compelling—or even more compelling—inferences, or declare the identified inferences to be speculation. He must show that the identified inferences are irrational. That is a heavy burden; that is undoubtedly why the Sixth Circuit describes the *Jackson* standard as "a nearly insurmountable hurdle." *Davis*, 658 F.3d at 534 (quoting *Oros*, 578 F.3d at 710).

Judge Jansen dissented from the majority's conclusion regarding Petitioner's sufficiency of the evidence challenge, noting that she was "not convinced that the prosecution presented

14

sufficient evidence to support defendant's convictions of delivery of heroin or delivery of heroin causing death beyond a reasonable doubt" *Id.* at *13 (Jansen, J., concurring in part and dissenting in part). Petitioner states that he "agrees with Judge Jansen and hereby adopts her argument as his own," asserting that the majority unreasonably applied clearly established precedent or unreasonably determined the facts in light of the evidence presented. (ECF No. 2, PageID.72.)

In her opinion, Judge Jansen rejected the testimony provided by Lo regarding Petitioner's alleged "confession." She stated:

> Lo testified that he had purchased heroin from defendant on one prior occasion, but the two men were not companions. It seems unlikely that defendant would volunteer, unprompted, sensitive information to a near total stranger during a 20–minute interaction. It also seems unlikely that Lo, aware of the circumstances surrounding Singer's death, did not encourage the exchange of information. Notably, neither Trim nor Connelly, two of the "kids" accompanying Singer to defendant's house on September 11, 2013, testified that they had seen defendant with any heroin that day. I can conceive of no reason for Trim and Connelly to lie about their dealings with defendant. Indeed, both Trim and Connelly readily admitted that they purchased "other narcotics" from defendant during their visit, and aside from the mention of heroin, Lo's testimony was otherwise cumulative.

> I also question whether Lo's highly prejudicial hearsay account of defendant's statements would have been considered admissible at trial to prove the charge of delivery of heroin causing death, had defense counsel not agreed to consolidate the trial of charges arising from two unrelated incidents. However, credibility determinations are reserved for the jury, and I agree with the majority's conclusion that, when coupled with testimony from Trim and Connelly explaining that they and Singer visited defendant's home on September 11, 2013, Lo's testimony supports the inference that defendant sold heroin to "another person" in Singer's "group" on that day. However, Lo's testimony is certainly not enough to support, beyond a reasonable doubt, an inference that the heroin defendant sold to a member of Singer's "group" was the heroin that Singer later ingested.

*Olger*, 2017 WL 2799896, at *17 (Jansen, J., concurring in part and dissenting in part). Judge Jansen further stated:

> There is simply no evidence that Trim or Connelly—who both testified that they purchased "molly" from defendant but denied purchasing heroin—sold, transferred, or shared heroin with Singer on September 11, 2013. Despite the majority's assertion to the contrary, the fact that Trim, Connelly, and Singer went to defendant's house to purchase other narcotics does not support the inference that

defendant sold them heroin. Neither does the fact that defendant and Singer shook hands as Singer left defendant's home. Trim did answer affirmatively when asked if he saw Singer and defendant "shake hands in any way" during their meetup on September 11, 2013. However, when asked whether he observed "any sort of hand-to-hand exchange between the Defendant and [Singer]," Trim answered in the negative. While the jury is certainly "free to believe or disbelieve" any of the evidence presented, it is not free to speculate or draw inferences unsupported by the evidence. And while the prosecution is not required to rule out every possible innocent explanation, it is required to affirmatively prove each element of a charged crime *beyond a reasonable doubt*. The jump from innocent handshake to delivery of the heroin that caused Singer's death requires a number of overlapping inferences—that defendant had heroin that day, that Singer requested and paid for heroin, that heroin was small enough or packaged in a way that it could be transferred, undetected, via a handshake, that defendant would transfer the heroin via handshake rather than handing it to Singer when, as Trim testified, the two spoke privately in another room—that involve pure speculation and are simply not supported by the evidence. When we review claims of insufficient evidence on appeal, we are required to draw all inferences in favor of the prosecution. But the standard refers to reasonable inferences, supported by the evidence and properly considered by the jury. When there is no evidence to support an inference, there is nothing to view in a light most favorable to the prosecution. We are not required to speculate in order to affirm a jury conviction. Again, we "must consider not whether there was *any* evidence to support the conviction but whether there was *sufficient* evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." *Wolfe*, 440 Mich. at 513–514 (emphasis added).

The majority suggests that the jury could reasonably infer that defendant provided Singer with the heroin that caused his death because "the heroin Singer consumed before his death was packaged similarly to the heroin defendant delivered on other occasions." This conclusion, like so much of the evidence cited by the majority, is based solely on speculation and unsupported inferences. As I have previously noted, it is impossible, on the evidence presented, to determine when or how Singer ingested the heroin that ultimately resulted in his death. It is therefore impossible to determine its form or its packaging. No one saw Singer with a lottery ticket, containing heroin or otherwise, on September 11, 2013, or September 12, 2013. Even the lottery tickets discussed at trial could not be conclusively tied to Singer's consumption of heroin on these dates. Trim testified that he entered the gas station restroom after Singer and observed two lottery tickets and a "powdery" substance. These tickets were never recovered or tested for heroin. The single lottery ticket discovered in Singer's vehicle after Singer's death tested positive for heroin. However, the lottery ticket was never fingerprinted, and there is no evidence of how long the ticket was in Singer's vehicle before its discovery. At least two other individuals had been in Singer's vehicle just in the four hours that evening between Singer's visit with defendant and Singer's arrival at Trim's house.

Of course, Trim's testimony regarding the observed lottery tickets, along with the heroin-positive lottery ticket discovered in Singer's vehicle, lend some support for

16

the inference that Singer consumed heroin that was packaged in lottery tickets on September 11, and September 12, 2013. Additionally, Trim testified that he had known defendant to package heroin in lottery tickets before the September 11, 2013 incident. This connection might be strong if lottery ticket packaging was unique to defendant. But it is well known that dealers frequently package heroin in folded lottery tickets. Indeed, Bruce Ferguson, the Chief of Police for the city of Dewitt, testified that "we know based on information that heroin or other drugs are typically packed in—in a lottery bet slip." And while the majority relies on the fact that defendant handed Lo a folded lottery ticket containing heroin during the November controlled buy as proof that defendant packages heroin in lottery tickets, I would point out that the heroin defendant obtained for Lo was *from another source*. This fact weakens even further the proposed exclusive connection between defendant and lottery-ticket packaged heroin.

The majority also suggests that Trim's calls to defendant between 2:00 a.m. and 3:00 a.m. on September 12, 2013, support the inference that defendant was the source of the heroin. But this inference is not supported by the evidence. Trim called defendant, one of "a few different people" he called that night, when he thought Singer might be overdosing. When asked why he called defendant, Trim responded: "I am guessing it was to ask what to do." The content of their conversation is not known. To assume that Trim reached out to defendant because defendant was the person who provided Singer with the heroin is to speculate far beyond the bounds reasonableness [sic]. Indeed, Trim testified that he did not see defendant with any heroin that day, and that he did not have any knowledge of the source of the heroin Singer ingested. It is not, however, unreasonable to infer that Trim called defendant because defendant was his friend and a known dealer, and Trim had seen defendant earlier that day. In fact, Singer's best friend, Mitchell Pollie, testified that he also received a number of incoming calls and text messages from Trim during the early hours of September 12, 2013. Trim also called Pollie when he noticed Singer had stopped breathing, shortly before 10:30 a.m. that day. Likewise, defendant's expression of interest and concern after Singer's death, especially in light of Trim's decision to directly involve defendant in the incident, does not support the "reasonable inference" that he was guilty of a crime.

In reaching its conclusion, the majority also reasons that "there was no evidence to suggest that Singer consumed heroin procured from different 'sources' in the events leading up to his death." This suggestion is both factually inaccurate and legally inappropriate. First, there was evidence that Singer procured heroin from a source other than defendant. Pollie testified that he sometimes received heroin from Singer, and that during an earlier interview, he had told the police that Singer purchased his heroin from someone named "Jamo" who worked with Singer at a smoke shop. Similarly, although he changed his story at trial, Trim admitted that he told police officers in an interview shortly after Singer's death that he thought Singer had received the heroin from Jamo. Trim testified that during that same interview, he told the police officers that Singer had left his house on September 11, 2013 to "go to Jamo's to get Xanax." O'Leary also told the police that she

thought Jamo had been Singer's heroin source, although when she was interviewed, she admitted that this was "just a guess."

Moreover, there is no evidence, either direct or circumstantial, to establish that Singer *did not* possess the heroin before he accompanied his friends to defendant's home around 8:00 p.m. on September 11, 2013. To the contrary, the evidence supports the inference that Singer had access to a cornucopia of illicit substances. In addition to morphine, a heroin derivative, Singer's blood at time of death contained amphetamines, alprazolam, valproic acid, Citalopram, caffeine, and THC. During a search of Singer's vehicle, officers uncovered heroin residue, marijuana residue, a number of pills, including alprazolam and Tenazepam, and a package of syringes. There is no evidence to suggest that defendant was the source of any of the drugs or paraphernalia in Singer's vehicle or in his blood. Singer also had multiple opportunities on September 11, 2013, to obtain heroin from another source. Most notably, Singer was at a bar with his "group" for more than two hours between the time that they were at defendant's house and the time Singer and Trim returned to Trim's home. While it is possible to assume that Singer had only recently acquired the heroin he waited to consume until after he left the bar, it is equally possible to assume that Singer's vehicle had contained the heroin before Singer visited defendant's house earlier that evening. It was Singer's vehicle Trim was driving when the two men stopped at the gas station where Trim assumed Singer had consumed heroin. According to Trim, Singer also returned to his vehicle to "shoot up" after arriving at Trim's house. And it was from Singer's vehicle that the only physical evidence of heroin was discovered, on a piece of a lottery ticket. It was also Singer's vehicle that Singer, Trim, and Connelly took to visit defendant's home that day. And although Singer had passengers in his vehicle from that point forward, none of them testified to seeing Singer stow heroin in his vehicle.

Although I agree that the prosecutor was not required to negate every reasonable theory consistent with defendant's innocence, I cannot agree with the majority's implied suggestion that the prosecution was somehow relieved of affirmatively proving the elements necessary to support a conviction beyond a reasonable doubt. The *lack* of evidence supporting a theory other than the prosecution's does not constitute evidence supporting the prosecution's theory. A criminal defendant is not required to prove anything. To hold otherwise is to improperly shift the burden of proof onto the defendant, who is presumed innocent until the prosecution has proven guilt beyond a reasonable doubt.

I also recognize that the mere existence of alternative inferences, reasonably and logically drawn from the facts presented, is not enough to justify overturning a jury conviction. See *People v. Hardiman*, 466 Mich. 417, 431; 646 N.W.2d 158 (2002) (stating that "it is simply not the task of an appellate court to adopt inferences that the jury has spurned"), quoting *Wolfe*, 440 Mich. at 514–[]15. My conclusion rests not on the adoption of alternative reasonable inferences. I mention alternative interpretations simply to illustrate the ease of speculation and the dearth of evidence to support the "inferences" the majority would attribute to the jury in this case. The

> reality is that no evidence connects defendant to the heroin Singer consumed before his death on September 12, 2013. Defendant's conviction was therefore not based on the available evidence, but on speculation and conjecture. It was the prosecution's burden to prove, beyond a reasonable doubt, that heroin delivered by defendant to Singer or one of Singer's friends caused Singer's death. The prosecution failed to meet that burden here.

*Id.* at *17–19. (footnote omitted).

Petitioner has not met the burden set forth above by relying on Judge Jansen's dissent. Although Petitioner invites the Court to adopt Judge Jansen's reasoning, he simply has not shown that the majority's detailed analysis of the evidence and the inferences drawn from that evidence are irrational. Rather, Petitioner asks the Court to adopt Judge Jansen's approach, reweigh the credibility of the witnesses, and resolve all conflicts and make all inferences in his favor. However, it is up to the jury to decide issues of credibility, to decide between conflicting accounts, and draw inferences—so long as the inferences are rational. *See Herrera*, 506 U.S. at 401–02 (1993); *Martin*, 280 F.3d at 618. This Court is only required to look at the evidence in a light that favors the prosecution and assess whether a rational factfinder could conclude that Petitioner is guilty beyond a reasonable doubt in light of that evidence. Petitioner's invitation for this Court to turn *Jackson* on its head and resolve all conflicts in his favor is inappropriate.

Petitioner has failed to demonstrate that the court of appeals' determination that there was sufficient evidence to support the verdict is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, he is not entitled to relief on habeas ground I.

## B.    Ground III—Judicial Bias

In ground III, Petitioner contends that the trial court violated his due process rights by displaying bias or the appearance of bias in several ways. (ECF No. 1, PageID.7.) Petitioner contends that the trial court: (1) criticized Petitioner's counsel for consulting with Petitioner about the prosecution witnesses; (2) criticized Petitioner's counsel's questioning of witnesses;

(3) demeaned counsel about his legal knowledge; (4) implied that Petitioner's sentence would be affected by his displayed "undercurrent"; and (5) expressed disbelief during Petitioner's testimony. (*Id.*)

"[T]he Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904–905 (1997) (citations omitted). However, because of the difficulty in determining "whether a judge harbors an actual, subjective bias," the courts look to "whether, as an objective matter, the average judge in [that judge's] position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 579 U.S. 1, 9 (2016) (internal quotation marks omitted); *see also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 883 (2009) ("The difficulties of inquiring into actual bias . . . simply underscore the need for objective rules.").

The Supreme Court has recognized constitutionally impermissible, objective indicia of bias in the following types of cases: (1) those cases in which the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey v. Ohio*, 273 U.S. 510, 523 (1927); (2) certain contempt cases, such as those in which the "judge becomes personally embroiled with the contemnor," *Offut v. United States*, 348 U.S. 11, 17 (1954); *see also Taylor v. Hayes*, 418 U.S. 488 (1974); and (3) cases in which a judge had prior involvement in the case as a prosecutor, *Williams*, 579 U.S. at 8. The courts indulge "a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). As the Sixth Circuit has noted:

> The presumption of impartiality stems not merely from the judicial-bias caselaw, *see* [*Withrow*], but from the more generally applicable presumption that judges know the law and apply it in making their decisions, *see Lambrix v. Singletary*, 520 U.S. 518, 532 n.4 (1997), and the even more generally applicable presumption of

regularity, *see Parke v. Raley*, 506 U.S. 20, 30–31 (1992); *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926).

*Coley v. Bagley*, 706 F.3d 741, 751 (6th Cir. 2013).

In *Liteky v. United States*, 510 U.S. 540 (1994),[2] the Supreme Court described the showing

Petitioner would have to make to succeed on his bias claim:

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *See United States v. Grinnell Corp.*, 384 U.S. [563, 583 (1966)]. In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky*, 510 U.S. at 555–556 (emphasis in original).

---

[2] *Liteky* is a case that addresses the statutory recusal standard for federal judges. The Sixth Circuit has, nonetheless, relied on *Liteky* to provide the standard for assessing judicial bias claims under the Due Process Clause. *See Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002); *Lyell v. Renico*, 470 F.3d 1177, 1187 (6th Cir. 2006).

The court of appeals rejected Petitioner's claim in a thorough discussion, stating:

Defendant failed to raise a claim of judicial bias in the trial court, so we review this unpreserved issue for plain error affecting substantial rights. *People v. Carines*, 460 Mich. 750, 753; 596 N.W.2d 130 (1999). A defendant has a constitutional right to a fair and impartial jury trial. *People v. Cole*, 349 Mich. 175, 200; 84 N.W.2d 711 (1957). A trial judge's conduct deprives a defendant of a fair trial if it pierces the veil of judicial impartiality. *People v. Stevens*, 498 Mich. 162, 170; 869 N.W.2d 233 (2015). Judicial conduct pierces the veil of impartiality if it is reasonably likely that the conduct improperly influenced the jury by creating the appearance of partiality for or against a party under the totality of the circumstances. *Id.* at 171. When evaluating the totality of the circumstances, reviewing courts may consider a variety of factors including, among others, the tone and demeanor of the judge, the scope of conduct in the context of the length and complexity of the trial, the extent to which the conduct was directed at a single party, and the presence of a curative instruction. *Id.* at 172. "Judicial misconduct may come in myriad forms, including belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions." *Id.* at 172–173.

A defendant must overcome a strong presumption of judicial impartiality when raising a claim of judicial bias. *People v. Biddles*, —— Mich. App. ——, ——; —— N.W.2d —— (2016) (Docket No. 326140); slip op. at 2. "Comments that are critical of or hostile to counsel and the parties are generally not sufficient to pierce the veil of impartiality." *People v. Jackson*, 292 Mich. App. 583, 598; 808 N.W.2d 541 (2011). "Moreover, partiality is not established by expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women sometimes display." *People v. McIntire*, 232 Mich. App. 71, 105; 591 N.W.2d 231 (1998), rev'd on other grounds 461 Mich. 147 (1999).

Defendant argues that the trial court demeaned his counsel several times during the trial, which pierced the veil of impartiality under the totality of the circumstances. We disagree. Defendant first points to an instance in which the trial court criticized defense counsel for consulting with defendant about the prosecution's witness list, but this comment occurred outside the presence of the jury and therefore could not have improperly influenced the jurors. *Stevens*, 498 Mich. at 171. Defendant next identifies an instance of alleged judicial bias that occurred while defense counsel was questioning O'Leary:

*Q.* [T]here came a time when you knew that John, the decedent in this case, your boyfriend, consumed Xanax.

*A.* Yeah, on occasion.

*Mr. Stevens* [*The Prosecution*]: Your Honor, I am going to object, because the timeline he is asking is so vague that I don't know.

22

*The Court*: You got to clarify some—

*Mr. Watson*: I'll be happy to.

*The Court*: A lot of people taking Xanax for heaven's sake.

*Mr. Stevens*: With that I ask that the answer be stricken at this point.

*The Court*: Yeah. You got to connect that up.

*Mr. Watson*: I am happy to, Judge.

*The Court*: Otherwise it's stricken. It's irrelevant what somebody did a year before or six months before or what have you, okay?

*Q.* You told Detective Sandberg in an interview that you knew prior to the 11th of September of 2013, that John was a user or illicit drugs?

*Mr. Stevens*: Your Honor, I am going to object. You just indicated it's irrelevant what other people are doing in past—past time. We are talking about September 11th and 12th. The question clearly asks for something that occurred well beyond that.

*The Court*: Well, Mr. Watson, you got to ask questions that have some relevance to the dates in question.

*Mr. Watson*: Okay.

*The Court*: You can't just go bumbling off into space here.

Defendant does not argue that the trial court erroneously determined that the testimony concerning Singer's prior use of Xanax was irrelevant; rather, he argues that the court's comments reflected poorly on defense counsel. Defendant also points to comments the court made when defense counsel attempted to establish that O'Leary had no personal knowledge of the source of the heroin Singer consumed, which occurred during the following exchange:

*Q.* Any information that you have that caused you to have any belief that my client sold heroin to John comes from Jesse Trim?

*A.* Yes.

*Q.* Okay. So were you guessing, then, when you were telling the Detectives on September 12th?

*Mr. Stevens*: I guess I am going to object as to vague. Guessing as to what?

*The Court*: Well, I don't know where you are going. You've got to ask something—ask a question. Guessing about the sun? The moon?

23

*Q.* You were guessing about Jamal being the drug dealer, is that what you are telling us now?

*The Court*: Wait a minute. See, you got—I don't know what you are doing. You got to ask a question that has specifics so that he doesn't have to jump up and down every 30 seconds. Your question is struck.

A trial court may exercise control over the mode and order of interrogating witnesses to "make the interrogation and presentation effective for the ascertainment of the truth . . . ." MRE 611(a). Given the context, it was not improper for the trial court to conclude that defense counsel's questions were vague and the statement, "I don't know what you are doing," did not necessarily reflect poorly on defense counsel.

Defendant next identifies an exchange that occurred after Trim testified that he confronted Singer about lottery tickets he found in a gas station bathroom.

*Q* [*Mr. Stevens*]. What did he say?

*A.* I do not remember completely, but I remember him talking to me saying that—saying how he was just starting to do good and how he started getting to me and started telling me this story about how his grandparents found a pill in his shoe.

*Mr. Watson*: I guess I have to object to the—that's hearsay.

*The Court*: Wait. Wait. What are you talking about? It's an event.

*Mr. Watson*: It's a statement made by somebody other than the declarant.

*The Court*: Well, it's still an event. When it is the perception and the event, words can be an event. How do you ever put any evidence in of what anybody ever says if it has to be the way you say?

*Mr. Watson*: If he is talking about the event, that is the event that this moment in time where he is confronting this John—

*The Court*: Let me ask you a question.

*Mr. Watson*: If I may?

*The Court*: Sir.

*Mr. Watson*: If he is talking about that I have no objection to that, but what this witness is talking about is an event that he claims another person has said about some other time.

*The Court*: That's right.

*Mr. Watson*: That's hearsay in my estimation.

*The Court*: No, it isn't, sir. Let me explain to you. I have been doing this an awful, awful long time. And a person's perception of what somebody says is not offered for its truth. It's offered for what was said. It is an action, just like when you raised that cup is an action. Your objection is overruled, but thank you.

Defendant argues that counsel's objection was arguably valid and the trial court unnecessarily demeaned defense counsel before the jury rather than simply overruling his objection. It is not clear from the record why the prosecution asked Trim what Singer said when he confronted him about the lottery tickets, or why Trim relayed Singer's story about how his grandparents found a pill in his shoe. Under the circumstances, we agree that it was not as clear as the trial court implied that Trim's testimony about Singer's statements was admissible either as non-hearsay or as testimony falling within an exception to the rule excluding hearsay, see MRE 801–803, but an error by the trial court does not establish judicial bias. See *People v. Roscoe*, 303 Mich. App. 633, 647–648; 846 N.W.2d 402 (2014). Furthermore, the court's comments in overruling the objection were not overly demeaning.

Defendant points to an instance in which his counsel asked Trim during cross-examination if he needed to refresh his memory about a statement before Trim testified that he could not remember the statement. The prosecution objected and the trial court stated, "Mr. Watson, try to stick with the good questions, please." The trial court could have simply sustained plaintiff's [sic] objection, but his direction to "stick with the good questions" under the circumstances was not demeaning to the point that reversal is required.

Defendant further notes the trial court's comments when his attorney attempted to impeach Trim about a statement he made to law enforcement about Singer's drug paraphernalia.

*Q.* I draw your attention to page 9 of 10 of the third line down of that same interview of the 12th of September of 2013. And I quote you, oh, he had a bag of needles, and like, there is a spoon in there, close quote. Did you remove stuff to make sure there was nothing inside of your room?

*The Court*: Mr. Watson? Mr. Watson?

*Mr. Steve[n]s*: That wasn't a question.

*Mr. Watson*: It was an impeachment. He denied making that statement.

*The Court*: I understand, but now you ask him if he made it.

*Q.* Did you make that statement?

25

*The Court*: Do I have to get the evidence book out and have you study it tonight, sir?

*Mr. Watson*: No, Judge.

*The Court*: You have been doing this a long time.

*Mr. Watson*: Yes, I have.

*The Court*: So please slow down and do it correctly.

Although defendant does not explain why the trial court's comments were improper, and therefore could be said to have abandoned this alleged example of judicial bias, see *Mitcham v. Detroit*, 355 Mich. 182, 203; 94 N.W.2d 388 (1959), we nonetheless note that the statement, "Do I have to get the evidence book out and have you study it tonight, sir?" was obviously somewhat belittling toward defense counsel.

Defendant also points to an instance in which defense counsel stated to a witness, "Gotcha. Thanks for bringing that in. Appreciate that," and the trial court interjected, "Mr. Watson—that comment is stricken from this record. Mr. Watson, if you have something to ask, ask it. If you want to testify, get right up here and I'll swear you in." It was not improper for the court to instruct defense counsel to refrain from making non-inquisitorial comments to a witness, see MRE 611(a), and the judge's comment was not demeaning or belittling.

Defendant points to the following comment by the trial court when defense counsel concluded his questioning of Deputy Lo:

*Mr. Watson*: Okay. Thank you.

*Mr. Stevens*: Nothing. Thank you.

*The Court*: Well, as long as everybody else is bringing in everything that shouldn't come in, I suppose you could bring in some more, too. No?

*Mr. Stevens*: I am fine. Thank you.

We agree with defendant that the trial court's comment unnecessarily suggested that defense counsel may have been doing something improper.

Defendant points to certain comments that the trial court made, which he argues "implied that the Defendant's sentence would be affected by 'undercurrent' that he was displaying." But these comments were not made before the jury and therefore could not have improperly influenced the jurors. See *Stevens*, 498 Mich. at 171.

Defendant argues that the trial court improperly implied that defendant was not credible while he was testifying, given the following exchange with defense counsel:

> *Q* [*Mr. Watson*]. Keep your voice up.

> *A* [*Defendant*]. I'm sorry.

> *Q.* Okay. This is all being recorded and these people have to listen to what you have to say.

> *A.* Can you guys hear me?

> *The Court*: Don't be talking directly to the jury.

> *The Witness*: I'm sorry. I didn't know that. I didn't know.

> *The Court*: Really?

The trial court's comment could be read as expressing disbelief that defendant did not know that he should refrain from talking to the jury. See *Stevens*, 498 Mich. at 174 (explaining that it is inappropriate for a judge to express disbelief of a witness). However, the matter was not pertinent to defendant's substantive testimony, and it is unlikely that the off-handed remark affected the jury's determination regarding the defendant's credibility on the essential facts.

Defendant argues that the trial court improperly insinuated during the following exchange that defense counsel did not know the rules of evidence:

> *Q* [*Mr. Watson*]. Is that the time that he said it was his girlfriend's car?

> *A* [*Defendant*]. Yeah.

> *Q.* That it would be disrespectful to use drugs in her car?

> *A.* Yes.

> *The Court*: Mr. Watson, are you testifying now?

> *Mr. Watson*: No. I'm just asking mild leading questions.

> *The Court*: It sounds like you are testifying, sir. That wasn't a question. That was a statement. Ask questions.

This exchange makes clear that the court was not suggesting that defense counsel was unfamiliar with the rules of evidence, but rather that he was running afoul of them. See MRE 611(d) (providing that leading questions should generally not be used during direct examination of a witness). The court's statements were neither improper nor demeaning.

Defendant addresses the exchange between the trial court and defense counsel, discussed earlier in this opinion, regarding defendant's testimony that Trim told him during a phone conversation that Singer wanted to stop at Jamo's house. The trial court was understandably irritated that defense counsel wanted to suspend defendant's testimony so he and defendant could hold a private conference. Moreover, even assuming that the trial court's ruling excluding defendant's testimony was erroneous, this would not independently support a claim of judicial bias. See *Roscoe*, 303 Mich. App. at 648.

Finally, defendant argues that, at the close of trial, the trial court made several comments outside the presence of the jury that were representative of the hostile tone and demeanor the trial court generally displayed before the jury. Having reviewed the comments, we discern no hostility or bias, but rather a sincere explanation for the court's earlier frustration when defense counsel sought to hold a private conference with defendant while defendant was testifying. Moreover, because the comments were made outside the presence of the jury, they could not have improperly influenced the jurors. See *Stevens*, 498 Mich. at 171.

Collectively, the comments identified by defendant were made over the course of a four-day trial, and to the extent some of the trial court's comments could be viewed as demeaning or belittling, we note that the court made similar comments toward the prosecution. The court also instructed the jury that it could "only consider the evidence that was properly admitted" and that the "Court's comments, rulings, questions and instructions are not evidence." The court further instructed the jury, "If you believe that I have an opinion about how you should decide the case, pay no attention to that." We presume that jurors follow their instructions. *People v. Graves*, 458 Mich. 476, 486; 581 N.W.2d 229 (1998). "[A] curative instruction will often ensure a fair trial despite minor or brief inappropriate conduct." *Stevens*, 498 Mich. at 177. The trial court's conduct was not so egregious that a curative instruction could not ease any appearance of partiality. *Id.* at 177–178. Considering the totality of the circumstances, it is unlikely that the judge's conduct "improperly influenced the jury by creating the appearance of advocacy or partiality against defendant." *Id.* at 190.

*Olger*, 2017 WL 2799896, at *6–10. The court of appeals' rejection of Petitioner's bias argument focused on the issue as a matter of state law, looking to state authority. "[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law,

including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). The court of appeals' determination of state law is axiomatically correct.

Moreover, the court of appeals' analysis is not contrary to, or an unreasonable application of, clearly established federal law. The various circumstances that Petitioner describes do not fit clearly within the three situations that the *Liteky* Court set forth that bear objective indicia of bias. While some of the trial court's comments may be construed as demeaning or belittling, Petitioner has not demonstrated that such comments "derive[d] from an extrajudicial source" or that they "reveal[ed] such a high degree of favoritism or antagonism as to make fair judgment impossible." *See Liteky*, 510 U.S. at 555. Rather, the trial court's comments are more akin to the "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display." *Id.* at 556. Petitioner has failed to demonstrate that the court of appeals' determinations regarding the trial judge's purported bias are contrary to, or an unreasonable application of, clearly established federal law. Accordingly, he is not entitled to relief on habeas ground III.

### C.      Ground IV—Double Jeopardy

As his fourth ground for relief, Petitioner asserts that his convictions for delivery of a controlled substance causing death and delivery of less than 50 grams of a controlled substance violate the Fifth Amendment's Double Jeopardy Clause because "[o]ne cannot commit the former without committing the latter." (ECF No. 1, PageID.7.)

The Double Jeopardy Clause guarantees that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This clause protects against multiple punishments for the same offense. *See United States v. Dixon*, 509 U.S. 688, 696 (1993); *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *Costo v. United States*, 904 F.2d 344 (6th Cir. 1990). The protection against multiple punishments for the same criminal act "is designed

to ensure that the sentencing discretion of courts is confined to the limits established by the legislature." *Ohio v. Johnson*, 467 U.S. 493, 499 (1984). This guarantee serves principally as a restraint on courts and prosecutors, not on legislatures. *See Garrett v. United States*, 471 U.S. 773, 793 (1985) (discussing that there is no double-jeopardy violation when Congress intended to permit prosecution for continuing criminal enterprise after prior conviction for predicate offense); *Missouri v. Hunter*, 459 U.S. 359, 365–66 (1983). Therefore, when determining whether punishments are "multiple" under this aspect of the Double Jeopardy Clause, the Court is bound by the intent of the legislature. *Johnson*, 467 U.S. at 499; *Hunter*, 459 U.S. at 366–68.

In this context, the United States Supreme Court has traditionally applied the "same-elements" test first enunciated in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). *See Rutledge v. United States*, 517 U.S. 292, 297 (1996). The same-elements test, also known as the "*Blockburger* test," inquires whether each offense contains an element not contained in the other. If "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304. If not, they are the "same offense" and double jeopardy bars additional punishment. *See Brown v. Ohio*, 432 U.S. 161, 168–69 (1977). If the *Blockburger* test is satisfied, however, it is presumed that the legislature intended to punish the defendant under both statutes and there is no double jeopardy bar to multiple punishments. *See Whalen v. United States*, 445 U.S. 684, 691–92 (1980).

In *Whalen*, the defendant had been convicted in the Superior Court for the District of Columbia of rape and of killing the same victim in perpetration of rape. *Id.* at 685. He was sentenced to "consecutive terms of 20 years to life for first-degree murder, and of 15 years to life

for rape." *Id.* The Supreme Court granted certiorari to consider whether the imposition of cumulative punishments violated the defendant's double jeopardy rights. *Id.* at 686.

In concluding that Whalen's double jeopardy rights had been violated, the Court found that Congress had not authorized consecutive sentences "in the circumstances of [his] case." *Id.* at 690. After considering the legislative history of the provisions at issue, the Court noted that

> resort to the *Blockburger* rule leads to the conclusion that Congress did not authorize consecutive sentences for rape and for a killing committed in the course of the rape, since it is plainly not the case that "each provision requires proof of a fact which the other does not." A conviction for killing in the course of a rape cannot be had without proving all the elements of the offense of rape.

*Id.* at 693–94. The Court was "unpersuaded that [Whalen's] case should be treated differently for other cases in which one criminal offense requires proof of every element of another offense." *Id.* at 694.

As noted *supra*, Petitioner contends that his convictions for delivery of a controlled substance causing death and delivery of less than 50 grams of a controlled substance violate his double jeopardy rights. In rejecting this claim, the court of appeals stated:

> Finally, defendant argues that his convictions in Docket No. 331705 for delivery of a controlled substance causing death, MCL 750.317a, and delivery of less than 50 grams of a controlled substance, MCL 333.7401(2)(a)(*iv*), violated the Double Jeopardy Clauses of the United States and Michigan Constitutions. See U.S. Const., Am V; Const. 1963, art. 1, § 15. "The prohibition against double jeopardy provides three related protections: (1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense." *People v. Nutt*, 469 Mich. 565, 574; 677 N.W.2d 1 (2004). Because defendant's convictions in Docket No. 331705 arose "from the same conduct at the same trial, this case involves the multiple punishments strand of double jeopardy." *People v. Miller*, 498 Mich. 13, 17; 869 N.W.2d 204 (2015).
>
> "The multiple punishments strand of double jeopardy is designed to ensure that courts confine their sentences to the limits established by the Legislature and therefore acts as a restraint on the prosecutor and the Courts." *Id.* at 17–18 (quotation marks and footnotes omitted). "To determine whether a defendant has been subjected to multiple punishments for the 'same offense,' we must first look to determine whether the Legislature expressed a clear intention that multiple

31

punishments be imposed." *People v. Garland*, 286 Mich. App. 1, 4; 777 N.W.2d
732 (2009). If the Legislature clearly expressed an intention to impose multiple
punishments, imposition of such sentences does not violate the Constitution, even
if the offenses share the same elements. *People v. Ream*, 481 Mich. 223, 228 n. 3;
750 N.W.2d 536 (2008). "Conversely, where the Legislature expresses a clear
intention in the plain language of a statute to prohibit multiple punishments, it will
be a violation of the multiple punishments strand for a trial court to cumulatively
punish a defendant for both offenses in a single trial." *Miller*, 498 Mich. at 18.

*Olger*, 2017 WL 2799896, at *11. Although the court of appeals cited state court authority for the

standard, the standard applied is identical to *Blockburger*. Moreover, *Ream*, which was cited by

the court of appeals, cites to the *Blockburger* test. *See Ream*, 750 N.W.2d at 538–46. Thus, there

is no question that the court of appeals applied the correct standard.

Moreover, Petitioner has failed to demonstrate that the court of appeals' determination

regarding his double jeopardy claim is an unreasonable application of clearly established federal

law. The court of appeals stated:

We discern the Legislature's intent by interpreting the words of a statute based on
their ordinary meaning and the context in which they are used. *People v. Lowe*, 484
Mich. 718, 722–723; 773 N.W.2d 1 (2009). The controlled substances act, MCL
333.7101 *et seq.*, Article 7 of the Public Health Code, MCL 333.1101 *et seq.*,
provides in pertinent part the following:

(1) Except as authorized by this article, a person shall not manufacture, create,
deliver, or possess with intent to manufacture, create, or deliver a controlled
substance, a prescription form, or a counterfeit prescription form . . .

(2) A person who violates this section as to:

(a) A controlled substance classified in schedule 1 or 2 that is a narcotic
drug or a drug described in section 7214(a)(*iv*) and:

\* \* \*

(*iv*) Which is in an amount less than 50 grams, of any mixture containing
that substance is guilty of a felony . . . . [MCL 333.7401(1) and (2)(a)(*iv*).]

MCL 750.317a is encompassed by Chapter XLV, "Homicide," of the Michigan
Penal Code and provides the following:

A person who delivers a schedule 1 or 2 controlled substance, other than
marihuana, to another person in violation of section 7401 of the public

32

health code, 1978 PA 368, MCL 333.7401, that is consumed by that person or any other person and that causes the death of that person or other person is guilty of a felony punishable by imprisonment for life or any term of years.

"When one statute explicitly refers to provisions of another statute, those provisions are applicable and binding as though they had been incorporated and reenacted in the statute under consideration." *Kern*, 288 Mich. App. at 519–520.

The fact that MCL 750.317a expressly references MCL 333.7401 does not establish that the Legislature intended multiple punishments for those crimes. In *Miller*, 498 Mich. at 15, our Supreme Court addressed whether a defendant's convictions for "operating while intoxicated (OWI) and operating while intoxicated causing serious impairment of the body function of another person (OWI-injury) arising from a single intoxicated driving incident" violated the constitutional prohibition against double jeopardy. (Footnotes omitted.) The OWI-injury statute provided that a person, "'who operates a motor vehicle in violation of subsection (1) [the OWI statute] . . . and by the operation of that motor vehicle causes a serious impairment of a body function of another person is guilty of a crime . . . '" *Id.* at 20, quoting MCL 257.625(5).

The *Miller* Court determined that the Legislature expressed a clear intent not to impose multiple punishments for simultaneously violating the OWI and the OWI-injury statutes after reviewing MCL 257.625(7)(d), which created "a separate operating while intoxicated offense for individuals who drive while intoxicated with a minor in the car (OWI-minor)." *Miller*, 498 Mich. at 23. The OWI-minor statute expressly stated, "'This subsection does not prohibit a person from being charged with, convicted of, or punished for a violation of subsection (4) or (5) that is committed by the person while violating this subsection.'" *Id.*, quoting MCL 257.625(7)(d) (emphasis omitted). The fact that MCL 257.625(7)(d) specifically authorized multiple punishments led the Court to conclude that the Legislature "did not intend to permit multiple punishments for OWI and OWI-injury offenses arising from the same incident." *Miller*, 498 Mich. at 24 (emphasis omitted). The Court reasoned that, "if the Legislature had intended to allow multiple punishments for Subsections (1) and (5), it clearly knew how to do so, as evidenced by the specific authorization in MCL 257.625(7)(d)." *Id.* at 24–25.

The Michigan Penal Code contains numerous subsections specifically authorizing multiple punishments arising from the same conduct. Reading the Michigan Penal Code as a whole, see *People v. Feezel*, 486 Mich. 184, 205; 783 N.W.2d 67 (2010), the fact that MCL 750.317a does not expressly authorize multiple punishments could suggest that the Legislature intended to preclude such punishments. However, the Legislature's intent is less clear than in *Miller* because none of the specific authorizations in the Michigan Penal Code concern either MCL 750.317a or MCL 333.7401(2)(a)(*iv*). When legislative intent is not clear, Michigan courts apply the "abstract legal elements" test from *Ream*, 481 Mich. 223, to determine

whether the Legislature intended to classify two offenses as the "same offense" for purposes of double jeopardy. *Miller*, 498 Mich. at 19.

> Under the abstract legal elements test, it is not a violation of double jeopardy to convict a defendant of multiple offenses if each of the offenses for which defendant was convicted has an element that the other does not . . . . This means that, under the *Ream* test, two offenses will only be considered the same offense where it is impossible to commit the greater offense without also committing the lesser offense. [*Id.* (quotation marks and footnotes omitted).]

The elements of delivery of less than 50 grams of heroin are "(1) defendant's delivery; (2) of [less than 50 grams]; (3) of heroin or a mixture containing heroin; (4) with knowledge that he was delivering heroin." *People v. Collins*, 298 Mich. App. 458, 462; 828 N.W.2d 392 (2012) (setting forth the elements for delivery of heroin in an amount between 50 and 540 grams). "Although the amount of the controlled substance is an element of a delivery offense, the defendant's knowledge of the amount is not an element." *Id.* In contrast, the elements of delivery of a controlled substance causing death are (1) a defendant's delivery to another person; (2) of a schedule 1 or 2 controlled substance other than marijuana; (3) with knowledge that he or she was delivering a controlled substance; (4) that the controlled substance was consumed by a person; and (5) that consuming the controlled substance caused the person's death. See MCL 750.317a; M Crim JI 12.2a. There is no requirement under MCL 750.317a to establish the amount of the controlled substance delivered to another person.

The greater offense in this case, MCL 750.317a, clearly contains elements that are not contained in a delivery offense under MCL 333.7401. The lesser offense of delivery of a controlled substance less than 50 grams, MCL 333.7401(2)(a)(*iv*), also contains an element—the amount of the substance—that is not an element of MCL 750.317a. See *People v. Mass*, 464 Mich. 615, 626; 628 N.W.2d 540 (2001) (explaining that the amount of a controlled substance is an element of a delivery offense). "Under the abstract legal elements test, it is not a violation of double jeopardy to convict a defendant of multiple offenses if each of the offenses for which defendant was convicted has an element that the other does not . . . ." *Miller*, 498 Mich. at 19 (quotation marks and citation omitted). Defendant could be convicted of MCL 750.317a without being convicted of MCL 333.7401(2)(a)(*iv*), depending on the amount of the controlled substance involved. Therefore, defendant's separate convictions for delivery of less than 50 grams of a controlled substance and delivery of a controlled substance causing death do not violate the constitutional protection against double jeopardy.

*Olger*, 2017 WL 2799896, at *11–12 (footnote omitted).

Petitioner argues that the court of appeals' decision was objectively unreasonable because

his convictions "punished the same conduct when it was not the Legislature's intent to do so."

(ECF No. 2, PageID.122.) He avers that in order to violate MICH. COMP. LAWS § 750.317a, "one must deliver a certain amount of controlled substance" and, therefore, the court of appeals' notation that a defendant can be convicted of § 750.317a without being convicted of § 333.7401(2)(a)(*iv*) is unreasonable. (*Id.*, PageID.127.)

Petitioner, however, ignores the fact that the question for purposes of a double jeopardy analysis is "essentially one of legislative intent." *Johnson*, 467 U.S. at 499. For purposes of federal habeas review, "[w]hen assessing the intent of a state legislature, a federal court is bound by a state court's construction of that state's own statutes" and "by a state court's determination of the legislature's intent. *Banner v. Davis*, 886 F.2d 777, 780 (6th Cir. 1989) (citing *Hunter*, 459 U.S. at 368; *O'Brien v. Skinner*, 414 U.S. 524, 531 (1974); *Ohio v. Johnson*, 467 U.S. 493, 499 (1983)). "Thus, for purposes of double jeopardy analysis, once a state court has determined that the state legislature intended cumulative punishments, a federal habeas court must defer to that determination." *Volpe v. Trim*, 708 F.3d 688, 697 (6th Cir. 2013) (quoting *Banner*, 886 F.2d at 777). Petitioner's claim for relief is, therefore, squarely foreclosed by the Michigan Court of Appeals' determinations that the Michigan legislature intended for delivery of a controlled substance causing death and delivery of less than 50 grams of a controlled substance be subject to separate punishments. Petitioner has failed to demonstrate that the court of appeals' determination regarding his double jeopardy claim is contrary to, or an unreasonable application of, clearly established federal law. Habeas ground IV will, therefore, be dismissed.[3]

---

[3] In any event, Petitioner has not been subjected to additional punishment as set forth in *Brown*. As noted above, the trial court sentenced Petitioner to **concurrent** sentences for his convictions. (J. of Sentence, ECF No. 9-15, PageID.988.) Moreover, even if Petitioner's convictions violated double jeopardy principles, the proper remedy under Michigan law would be only to "affirm the conviction on the greater charge and to vacate the conviction on the lesser charge." *See People v. Meshell*, 696 N.W.2d 754, 633–34 (Mich. Ct. App. 2005). Doing so would have no effect on the amount of time Petitioner has been sentenced to serve.

### D.      Ground V—Prosecutorial Misconduct by Misrepresenting Testimony

As his fifth ground for relief, Petitioner contends that the prosecution committed misconduct by misrepresenting Deputy Lo's "testimony regarding the price of heroin, which resulted in an unfair trial because the price of heroin was a key factor in determining whether the victim . . . and his friends[] bought heroin from Petitioner." (ECF No. 1, PageID.8.)

Overall, for claims of prosecutorial misconduct, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Court has emphasized a series of factors to be evaluated when making this determination: (1) whether the comments were isolated or pervasive; (2) whether the comments were deliberately or accidentally put before the jury; (3) the degree to which the remarks had a tendency to mislead and prejudice the defendant, (4) whether the prosecutor manipulated or misstated the evidence; (5) the strength of the overall proof establishing guilt; (6) whether the remarks were objected to by counsel; and (7) whether a curative instruction was given by the court. *See id.* at 182–83; *United States v. Young*, 470 U.S. 1, 12–13 (1985); *Donnelly*, 416 U.S. at 646–47. The touchstone of this analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

In rejecting Petitioner's claim, the trial court stated:

Defendant contends that the prosecutor mischaracterized the testimony of Deputy Lo by stating that Deputy Lo testified that the price of heroin started at $50.00 per gram, when he actually testified that he could not say because it varied. However, when reviewing the transcript, it appears Defendant is overstating the discrepancies between the testimony of Deputy Lo and the closing rebuttal of the prosecutor. The section of the prosecutor's rebuttal that Defendant is referring to states:

And Deputy Lo's response was it depends on the dealer. It depends on the supplier, and his number started at 50. He said it goes as low as 50 and it can go as high depending on the—depending on the weight.

36

(11/23/15 Trial Trans., p. 40). Deputy Lo had actually testified that:

> To be honest with you, sir. It's—it always varies per dealer, per quality of the product. If you're going through a middle man, it's going to cost you a little bit more if you are not going directly to the guy who is holding the product. So to give you definitive, it's $50, I couldn't do that. It varied.

(11/20/15 Trial Trans., p. 86).

> While the prosecutor did not quote the testimony of Deputy Lo word for word, his recap was similar to the actual testimony. Regardless, statements made by the attorneys during opening and closing statements are not evidence to be considered by a jury. The trial court read M Crim JI 3.5, which clarified to the jury that "The lawyers' statements and arguments are not evidence." (11/23/15 Trial Trans., p. 48). The jury was to rely upon the actual testimony of Deputy Lo, and not upon a summary stated by the prosecutor during closings. Defendant suffered no "actual prejudice" in this matter because it is very unlikely that Defendant would have been acquitted if the prosecutor's slight mischaracterization of Deputy Lo's testimony, during his rebuttal, had been struck by the trial court.

(ECF No. 9-14, PageID.954–55.)

Petitioner contends that the prosecutor's misrepresentation "resulted in an unfair trial because the price of heroin was a key factor in determining whether the victim, Jonathan Singer, and his friends[] bought heroin from" him. (ECF No. 2, PageID.130.) Petitioner argues that Jesse Trim testified that he and his friends bought one gram of ecstasy, not heroin, from Petitioner for $50.00, and that the only evidence that Petitioner provided the heroin that killed Singer was Deputy Lo's testimony. (*Id.*) Petitioner notes, however, that when he sold heroin to Deputy Lo, he sold Deputy Lo "less than *one quarter* of a gram of heroin . . . for *eighty dollars ($80)*." (*Id.*) Petitioner speculates that the prosecutor's misstatement "gave the false impression that there was much more evidence than there actually was that Petitioner provided the heroin that caused Singer's death." (*Id.*, PageID.135.)

Petitioner, however, has simply not demonstrated that the prosecutor's misstatement induced the jury "to trust the Government's judgment rather than its own view of the evidence." *See Young*, 470 U.S. at 18–19. He offers no basis for the Court to disregard the trial court's factual

finding regarding the comments made by the prosecution. The Court, therefore, is compelled to conclude that the resolution of Petitioner's prosecutorial misconduct claim is entirely consistent with clearly established federal law. Whatever harm was caused by the prosecutor's misstatement during closing arguments was sufficiently remedied by the trial court's instruction that counsels' arguments were not evidence. Petitioner, therefore, is not entitled to relief on habeas ground V.[4]

### E.    Ground VII—Harsher Punishment Based on Petitioner's Testimony

As ground VII, Petitioner contends that the trial court violated his due process rights by imposing a harsher sentence based upon Petitioner's decision to testify in his own defense and admit guilt to the charge that he delivered heroin to Deputy Lo on November 12, 2013. (ECF No. 1, PageID.10.) Petitioner avers that the trial court criticized him for admitting to the offense and then "immediately sentenced Petitioner to a 220-month prison term on the most serious charge, delivery of heroin causing Jonathan Singer's death, . . . even though Petitioner's Presentence Investigation Report recommended only a 156-month term." (*Id.*, PageID.11.)

When sentencing a defendant, a "judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446 (1972). A sentence may violate due process, however, if it is based upon material "misinformation of constitutional magnitude." *Roberts v. United States*, 445 U.S. 552, 556 (1980). To prevail on such a due process claim, the

---

[4] Petitioner argues that in *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005), a case that he contends involved "circumstances similar to those here," the Sixth Circuit granted habeas relief "on a claim that the prosecutor mischaracterized evidence and rejected the state's argument that general jury instructions like those given here cured the error." (ECF No. 2, PageID.140.) This Court's review of *Hodge*, however, leads to a conclusion that it is not akin to Petitioner's case. The Sixth Circuit in *Hodge* noted that the prosecutor there continued to repeat improper arguments and that if counsel had objected to those repetitive comments, it may have suggested to the trial court the need for "specific curative instructions." *See Hodge*, 426 F.3d at 388–89. Here, however, Petitioner takes issue with one misstatement made by the prosecutor during his rebuttal argument.

petitioner must demonstrate that: (1) the information before the sentencing court was materially false; and (2) that the court relied on the false information in imposing the sentence. *Tucker*, 404 U.S. at 447; *see also United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984). A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 444, 447.

Here, Petitioner takes issue with the following statement by the sentencing judge immediately before pronouncing sentence:

> But I can honestly say your client is one of the more dastardly people that I have faced in this courtroom in a long time. He actually gets up here and admits to a 30-year felony. Just sits there on the stand and admits, oh, well, who cares, 30 years.

(Sentencing Tr., ECF No. 9-12, PageID.854.) The judge's statement was related to Petitioner's testimony at trial. During trial, Petitioner admitted that he had delivered heroin to Deputy Lo on November 12, 2013. (Trial Tr. III, ECF No. 9-10, PageID.816–817, 821.) Petitioner avers that he never said "oh, well, who cares, 30 years" or anything similar, and that there was "nothing flippant or disrespectful or 'dastardly' about" his testimony. (ECF No. 2, PageID.163.) Petitioner argues that the "plain meaning of the state trial court's words, in connection with the sentence imposed, was clearly that the trial court considered Petitioner's admission of guilt against him in imposing sentence." (*Id.*, PageID.164.)

In its opinion denying Petitioner's motion for relief from judgment, the trial court rejected Petitioner's claim, stating:

> Defendant's final argument is that the trial court "punished" him for exercising his right to testify on his own behalf at trial. However, there is no evidence that the trial court attempted to "punish" Defendant because of the *act* of testifying, but rather, the trial court took into account the *content* of what was testified to by Defendant. A sentencing judge is certainly allowed to consider any testimony that he or she heard during a trial, including the testimony of a defendant, as well as any allocution at the time of sentencing. While a defendant has a Sixth Amendment

right to testify at his or her trial, he or she also has a Fifth Amendment right to not testify at trial. This is because statements made by a defendant can be used against them. Based on the sentencing statements of Judge Collette, it appears likely that some of the statements made by Defendant at trial helped Judge Collette decide to sentence Defendant toward the higher end of the sentencing guidelines. However, this is no way violated the Constitutional rights of Defendant in this matter.

(ECF No. 9-14, PageID.956.)

Petitioner simply fails to point out any constitutional issue with the sentencing court's consideration of his testimony. Petitioner cites *Ketchings v. Jackson*, 365 F.3d 509 (6th Cir. 2004), in support of his argument. (ECF No. 2, PageID.164.) In *Ketchings*, the Sixth Circuit concluded that the sentencing judge violated the petitioner's Fifth Amendment rights by "referr[ing] negatively directly and indirectly to [the petitioner's] continued assertion of his belief in his innocence and implied that [the petitioner] would be sentenced more leniently if he accepted the jury's verdict, that is, if he gave up his Fifth Amendment privilege to . . . refuse to admit guilt." *Ketchings*, 365 F.3d at 512–13. Petitioner's reliance on *Ketchings*, however, is misplaced. Unlike in *Ketchings*, Petitioner here was not penalized for implicating his Fifth Amendment rights. Instead, Petitioner admitted to dealing heroin. In holding that admission against Petitioner, the trial court in no way relied upon materially false information when sentencing Petitioner. Therefore, Petitioner has not demonstrated that the trial court's consideration of, and reliance upon, Petitioner's trial testimony was contrary to, or an unreasonable application of, the clearly established federal law set forth in *Tucker* or *Roberts*. Petitioner, therefore, is not entitled to relief on ground VII.

### F.      Ineffective Assistance of Trial Counsel Grounds

#### 1.      Standard of Review

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a

claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ." (citing *Harrington*, 562 U.S. at 102)).

Petitioner's first two ineffective assistance of trial counsel claims were considered by the court of appeals, whereas his second two were considered by the trial court when considering Petitioner's motion for relief from judgment. With respect to Petitioner's ineffective assistance claims, the court of appeals set forth the following standard of review:

> "To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) that his attorney's performance was objectively unreasonable in light of prevailing professional norms; and (2) that he was prejudiced by the deficient performance." *People v. Walker*, 497 Mich. 894, 895; 855 N.W.2d 744 (2014). "To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *People v. Carbin*, 463 Mich. 590, 600; 623 N.W.2d 884 (2001). We presume that counsel was effective and a defendant must overcome a strong presumption that counsel's actions constituted sound trial strategy. *People v. Cooper*, 309 Mich. App. 74, 80; 867 N.W.2d 452 (2015). "Decisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy[.]" *People v. Horn*, 279 Mich. App. 31, 39; 755 N.W.2d 212 (2008). We will not substitute our judgment for that of counsel regarding strategic matters and will not assess counsel's competence with the benefit of hindsight. *People v. Garza*, 246 Mich. App. 251, 255; 631 N.W.2d 764 (2001).

*Olger*, 2017 WL 2799896, at *4. When considering Petitioner's motion for relief from judgment, the trial court set forth the quoted language from *Walker* and *Carbin* that was relied upon by the court of appeals. (ECF No. 9-14, PageID.955.) Although the state courts cited state court authority for the standard, the standard applied is identical to *Strickland*. Moreover, if one looks to *Carbin*, the source of the standard is identified as *Strickland*. *See Carbin*, 623 N.W.2d at 889. Thus, there is no question that the state courts applied the correct standard. The Court, therefore, will consider whether the state courts reasonably applied the standard for each of Petitioner's claims of ineffective assistance of counsel.

## 2.      Ground II—Failing to Prepare for Trial and Object to Judicial Bias

### a.      Failing to Prepare for Trial

In the first part of ground II, Petitioner claims that counsel failed to adequately consult with him prior to trial about his testimony and therefore "did not know that Petitioner could testify to an excited utterance made by Jesse Trim to the effect that Jonathan Singer wanted to see Jamo (a person who had sold Singer heroin previously) on the night of Singer's death." (ECF No. 1, PageID.6.)

The court of appeals rejected Petitioner's claim, stating:

Defendant first argues that his counsel failed to adequately prepare for trial. "A defendant is entitled to have his counsel prepare, investigate, and present all substantial defenses." *People v. Kelley*, 186 Mich. App. 524, 526; 465 N.W.2d 569 (1990). "A substantial defense is one that could have affected the outcome of the trial." *People v. Putman*, 309 Mich. App. 240, 248; 870 N.W.2d 593 (2015). Reviewing courts must determine whether "strategic choices [were] made after less than complete investigation, or if a reasonable decision [made] particular investigations unnecessary." *People v. Ackley*, 497 Mich. 381, 389; 870 N.W.2d 858 (2015) (quotation marks and citation omitted; alterations in *Ackley*).

During defendant's direct examination, his counsel asked, "Do you need to speak with me privately before I end my examination of you?" to which defendant responded, "Yeah. I do. I should." The prosecution objected, and the trial court ruled that defense counsel was not allowed to privately confer with defendant, stating, "You have had months to discuss this case with your client." Defense counsel then asked defendant, "Is there something about a phone call that you want to tell us about?" The court interjected and stated, "You've got to ask a specific question that directs your witness to an area of inquiry so the Prosecutor and me know what it is." Defense counsel continued to question defendant:

*Q.* A moment ago you used the word phone call when responding to my question about whether you needed to speak to me. Do you remember that just a few minutes ago?

*A.* Yes.

*Q.* Okay. What is it that you wanted us to know?

*A.* He was naming—

*Q.* He who?

43

*A.* Jesse [Trim], when he called me about the overdose, and I remember saying to him, I'm, like, why did you—why did you allow someone to mix heroin with Xan[a]x?

*Q.* Why is that something important to you?

*A.* I just thought it was dumb. And he said right away, he said, it's not my fault. *He wanted to stop at Jamo's.* [Emphasis added.]

The prosecution objected to defendant's testimony on hearsay grounds. Defense counsel argued that Trim's statement was admissible as an exited utterance. The trial court stated the following:

*The Court*: No. No. That's—don't even consider that, ladies and gentleman, please. This is out of—I don't know where it's from. It is disregarded completely. Move on.

*Mr. Watson* [*Defense Counsel*]: You want my foundation for that, then?

*The Court*: What I want you to do is ask a question so that we know what the proposed answer could be ahead of time instead of saying, would you like to add anything else?

*Mr. Watson*: Okay, Judge.

*The Court*: I have told you now twice, and now you did it and let him sneak that in when you knew there would be a problem with it. So I don't like it, Mr. Watson. Why do you do this? That is stricken, sir. Do you understand now?

Defense counsel continued to ask defendant about Trim's demeanor during the phone conversation. The trial court then interjected, stating the following:

*The Court*: Excuse me. I have already stricken this.

*Mr. Watson*: All right. Judge.

*The Court*: It has been—wait a minute. What do I have to do here? Do I need to get down and throw something at you to get you to understand that I struck this line of inquiry? Where do I have—what do I need to say to get you attention? Is this word contempt something you like to hear?

*Mr. Watson*: Not really, Judge.

*The Court*: Then I would suggest that you follow the Court's order. If I am wrong, those illustrious people downtown will overrule me. It doesn't happen often, but it has, and maybe you are right.

44

*Mr. Watson*: In explanation, Judge?

*The Court*: I don't want an explanation. Why don't you stop? Ask your question if you have another area. Stop it. What can I do with you? I'm sorry. It's the end of it. Next question.

Defendant argues that this exchange could have been avoided if his counsel had adequately prepared by discussing defendant's testimony with him before trial. Defendant's testimony regarding Trim's statement that Singer "wanted to stop at Jamo's" may have been admissible as an exited utterance. See MRE 801(c); 802; 803(2). However, it is not clear from the record whether the trial court struck defendant's testimony about Trim's statement because the court erroneously believed that the testimony was inadmissible hearsay or because the court did not approve of the manner in which defense counsel elicited the testimony. To the extent the trial court improperly excluded defendant's testimony about Trim's statement as inadmissible hearsay, this is an evidentiary issue that defendant abandoned on appeal by failing to raise it in his statement of the questions presented. See *People v. McMiller*, 202 Mich. App. 82, 83 n. 1; 507 N.W.2d 812 (1993). Alternatively, if the trial court excluded defendant's testimony because of the purportedly improper manner in which defense counsel elicited the testimony, this is not apparent from the record and therefore cannot support defendant's ineffective assistance claim. See *Heft*, 299 Mich. App. at 80.

Moreover, defendant cannot demonstrate that defense counsel's alleged failure to properly elicit defendant's testimony concerning Trim's statement deprived him of a substantial defense or prejudiced his trial. Defense counsel questioned O'Leary, Trim, and a friend of Singer's, Mitchell Pollie, about their statements to law enforcement that Singer received heroin from "Jamo" or "Jamal." During his closing argument, defense counsel argued that the testimony presented a "theory that the source of this heroin was not in fact, my client at all, but this fellow Jamo." Accordingly, the jury was presented with evidence and argument that Singer obtained the heroin from someone other than defendant. Nonetheless, the jury found beyond a reasonable doubt that defendant was the source. Defendant has not shown that his counsel's conduct deprived him of a substantial defense or constituted outcome-determinative error.

*Olger*, 2017 WL 2799896, at *4–5 (footnote omitted).

While the court of appeals' determination of Petitioner's claim did not cite to any case law regarding ineffective assistance of counsel, its determination is entirely consistent with *Strickland*. Moreover, the court of appeals addressed the matter in terms of the *Strickland* test and using language typically associated with "harmless error" analysis. Under Michigan harmless error jurisprudence, unpreserved nonstructural constitutional error is reviewed under a plain error

45

standard. *People v. Cornell*, 646 N.W.2d 127, 142–43 (Mich. 2002); *People v. Carines*, 597 N.W.2d 130, 143 (Mich. 1999). To prevail, the defendant must show "a plain error that affected substantial rights." *Carines*, 597 N.W.2d at 143. The Michigan Supreme Court assesses whether the error affected the outcome of the proceeding to determine whether the defendant has made the necessary showing. *People v. Davis*, __ N.W.2d __, 2022 WL 779132, at *11 (Mich. Mar. 14, 2022) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). That is "the same kind of inquiry" the Michigan courts use to determine whether error is harmless: was it "outcome-determinative." *Id*. The Michigan Supreme Court equates "outcome determination" to "prejudice" when separating plain from harmless error, *People v. Vaughn*, 821 N.W.2d 288, 303 (Mich. 2012), and when applying the *Strickland* standard for ineffective assistance of counsel, *People v. Harris*, 840 N.W.2d 307, 308 (Mich. 2013).

The impact of an error on the outcome of the proceedings is also the focus of federal harmless error analysis. *See, e.g.*, *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (adopting as the standard for determining whether habeas relief if appropriate "whether the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict'"); *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (posing the question as "Do I, the judge, think that the error substantially influenced the jury's decision?"); *Brown v. Davenport*, 142 S. Ct. 1510, 1519 (2022) (stating "a state prisoner . . . must show that the error had a 'substantial and injurious effect or influence' on the outcome of his trial"). The appellate court's decision that the error was not outcome determinative, a determination to which this Court must defer,[5] is the equivalent of a

---

[5] *Brown* states that "a state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA." *Brown*, 142 S. Ct. at 1520. Accordingly, the Court must defer to that adjudication under § 2254(d)(1) unless the "petitioner persuades [the Court] that no 'fairminded juris[t]' could reach the state court's conclusion under [the Supreme] Court's precedents." *Id*. at 1525. This is a standard that is intentionally difficult to meet. *See Woods*, 575 U.S. at 316.

determination that the error was harmless under *Brecht*. *Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995). The determination that any error was harmless under *Brecht* necessarily means that it is not prejudicial under *Strickland*. *See Kyles*, 514 U.S. at 436 (explaining that the *United States v. Agurs*, 427 U.S. 97 (1976), materiality standard, later adopted as the prejudice standard for ineffective assistance of counsel claims, requires the habeas petitioner to make a greater showing of harm than is necessary to overcome the harmless error test of *Brecht*); *see also Wright v. Burt*, 665 F. App'x 403, 410 (6th Cir. 2016) ("[O]ur previous analysis of *Strickland* prejudice applies to the assessment of whether the Confrontation Clause violation was harmless error under *Brecht*."); *Bell v. Hurley*, 97 F. App'x 11, 17 (6th Cir. 2004) ("Because we find the error to be harmless [under *Brecht*] Bell cannot meet the prejudice requirement of *Strickland*. . . ."); *Kelly v. McKee*, No. 16-1572, 2017 WL 2831019 at *8 (6th Cir. Jan. 24, 2017) ("Because Kelly suffered harmless error [under *Brecht*] at best, he cannot establish that he suffered prejudice [under *Strickland*]."). Thus, once the Court defers to the determination that any error was not outcome determinative, it necessarily follows that Petitioner cannot establish prejudice under *Strickland* for counsel's alleged failure to adequately prepare Petitioner for trial and his failure to have the alleged excited utterance admitted as evidence.

In sum, Petitioner has failed to demonstrate that the court of appeals' rejection of his ineffective assistance claim premised upon counsel's alleged failure to adequately prepare for trial is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, the first part of habeas ground II will be dismissed.

### b.   Failure to Object to Judicial Bias

In the second part of ground II, Petitioner faults trial counsel for failing to object to the alleged judicial bias discussed *supra*. (ECF No. 1, PageID.6.) He contends that counsel should

have objected to the trial court's "persistent and widespread displays of partiality toward Petitioner

and toward defense counsel." (*Id.*) In rejecting this claim, the court of appeals noted:

> Defendant argues that his counsel was ineffective for failing to object to the trial court's judicial bias, as demonstrated by the already described exchange and other exchanges throughout his trial. As discussed in the next section of this opinion, the trial court's actions in this case were insufficient to support a claim of judicial bias. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v. Ericksen*, 288 Mich. App. 192, 201; 793 N.W.2d 120 (2010).

*Olger*, 2017 WL 2799896, at *6.

As discussed above, Petitioner has failed to demonstrate that the court of appeals' rejection

of his underlying judicial bias claim is contrary to, or an unreasonable application of, federal law.

Thus, counsel had no basis on which to object to the alleged bias, and "[o]mitting meritless

arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741,

752 (6th Cir. 2013); *see also Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice

flows from the failure to raise a meritless claim."). Petitioner has failed to show that the court of

appeals' rejection of his accompanying ineffective assistance claim is contrary to, or an

unreasonable application of, *Strickland*. Accordingly, Petitioner is not entitled to relief on the

second part of habeas ground II.

### 3.   Ground VI—Failure to Object to Mischaracterization of Testimony and Failing to Impeach Chief Bruce Ferguson

#### a.   Failure to Object

Petitioner's first part of habeas ground VI challenges trial counsel's failure to object to the

prosecution's mischaracterization of Deputy Lo's testimony in the manner set forth above. (ECF

No. 1, PageID.9.) The trial court rejected this claim, stating:

> In this motion, Defendant now contends that his trial counsel was ineffective for failing to object to the prosecutor's mischaracterization of Deputy Lo's testimony. As previously stated, the alleged mischaracterization of Deputy Lo's testimony was slight at best, and statements made during closing arguments do not constitute

48

> evidence in a trial anyway. Defendant's trial attorney's performance was certainly
> not unreasonable in failing to object in the middle of the prosecutor's closing
> rebuttal.

(ECF No. 9-14, PageID.955.)

The trial court's resolution of the claim on the first *Strickland* prong is compelling; but even if counsel's failure to object were considered unreasonable, Petitioner could not satisfy the second *Strickland* prong. The trial court expressly determined that the prosecutor's argument did not result in any prejudice to Petitioner. (ECF No. 9-14, PageID.954–955) (stating "Defendant suffered no 'actual prejudice' in this matter . . . "); *see also supra* Part.III.D. Petitioner has failed to show that the trial court's determinations that (1) counsel's failure to object to the prosecutor's closing argument was not unreasonable, and (2) that the prosecutor's purported mischaracterization of the evidence was not prejudicial, are contrary to, or an unreasonable application of, *Strickland*. Accordingly, Petitioner is not entitled to relief on the first part of habeas ground VI.

### b.       Failure to Impeach

The second part of habeas ground VI challenges counsel's failure to impeach Chief Bruce Ferguson "with his false statement in his affidavit for search warrant that 'Kiefer Olger, having the phone number . . . was observed by witnesses as having delivered [h]eroin to John Singer the night he died . . . . According to John Singer's phone records and witness statements, John Singer had contacted Kiefer Olger using his cell phone either calling or texting.'" (ECF No. 1, PageID.9.) Petitioner contends that no witness "ever indicated that they observed [Petitioner] delivering heroin to John Singer or anyone else the night Singer died, and there was no evidence at all that Singer contacted [Petitioner] using his cell phone, either calling or texting." (*Id.*) Petitioner asserts that Ferguson's statements were "blatant lies." (*Id.*)

49

"Decisions as to whether to call certain witnesses or what evidence to present are presumed to be matters of trial strategy, and the failure to call witnesses or present evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense." *Collins v. Berghuis*, No. 1:08-cv-369, 2011 WL 4346333, at *16 (W.D. Mich. Aug. 22, 2011) (citing *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison*, 303 F.3d at 749). Counsel's decisions regarding how to cross-examine a witness are matters of trial strategy, which are entitled to "great respect" by this Court. *See Glenn v. Sowders*, No. 85-5754, 1986 WL 18475, at *4 (6th Cir. Dec. 8, 1986); *see also Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997) ("Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel."). While there may be room for improvement in cross-examination, were that to be "the standard of constitutional effectiveness, few would be the counsel whose performance [pass] muster." *Henderson*, 118 F.3d at 1287 (quoting *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir. 1996)).

The trial court rejected Petitioner's claim, stating:

> Defendant also argues that his trial counsel was ineffective for failing to impeach police chief Bruce Ferguson with statements sworn to in his search warrant affidavit. Instead of trying to impeach the credibility of Chief Ferguson, Defendant's trial counsel chose to cross examine Chief Ferguson about the sequence of text messages sent between Defendant, Jesse Trim, and Austen Connelly, regarding the arrangements for the purchase of drugs on the night in question. (11/20/15 Trial Trans., p. 38-47). Trial counsel made the strategic decision to ask questions regarding the proposed purchase of drugs by a group of friends, including the deceased Mr. Singer, rather than focus on discrepancies between what Chief Ferguson believed to have occurred prior to getting the search warrant and what witnesses would actually testify to at trial. This constitutes sound trial strategy on the part of trial counsel, and certainly was not unreasonable in light of prevailing professional norms. The transcript also reflects that Defendant was consulting with his trial counsel prior to his trial counsel concluding his cross-examination, and yet no questions were posed regarding the search warrant affidavit. *Id.* at 46.

(ECF No. 9-14, PageID.955–56.)

Petitioner merely reiterates the arguments raised in his motion for relief from judgment to support his claim. Those arguments were rejected by the trial court, and the trial court's resolution of the issue was reasonable and well-supported by the record. Petitioner has not overcome the presumption that counsel's cross-examination of Chief Ferguson is entitled to "great respect" by this Court. *Glenn*, 1986 WL 18475, at *4. Petitioner has failed to show that the state court's rejection of his accompanying ineffective assistance claim is contrary to, or an unreasonable application of, *Strickland*. Accordingly, Petitioner is not entitled to relief on the second part of habeas ground VI.

### G.      Ground VIII—Ineffective Assistance of Appellate Counsel

As his last ground for relief, Petitioner asserts that appellate counsel was ineffective for failing to raise grounds V–VII. (ECF No. 1, PageID.11.) Petitioner contends that appellate counsel "instead raised only the clearly weaker claims I–IV." (*Id.*) In rejecting this claim, the trial court stated: "Appellate counsel cannot be ineffective for 'failing' to raise a meritless claim. *People v. Ericksen*, 288 Mich App 192, 201 (2010). Defendant has also failed to demonstrate 'actual prejudice' from any of the alleged irregularities that support his claim for relief." (ECF No. 9-14, PageID.956–957.)

The *Strickland* standard that applies to trial counsel also applies to appellate counsel. However, a criminal appellant has no constitutional right to have every non-frivolous issue raised on appeal. Rather, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme

Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

Petitioner argues that the trial court's rejection of the claim is contrary to clearly established Supreme Court precedent "because it is not an application of *Strickland*'s two-prong test, which is what the Supreme Court clearly held in *Robbins* applies to a claim that appellate counsel was constitutionally ineffective." (ECF No. 2, PageID.167 (citation omitted).) Petitioner, however, is mistaken. The fact that the trial court did not explicitly set forth a detailed analysis of the two prongs of *Strickland* to conclude that appellate counsel was not ineffective does not automatically equate to a conclusion that the analysis is contrary to clearly established law. As the Sixth Circuit has noted, "a petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit." *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013). The trial court had already rejected as meritless the underlying grounds for relief that Petitioner believes appellate counsel should have raised. Accordingly, no more needed to be said about appellate counsel's performance. Petitioner has not demonstrated that the trial court's rejection of his ineffective assistance of appellate counsel claim is contrary to, or an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to relief on ground VIII.

## IV.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

The Court will enter a judgment denying the petition and an order denying a certificate of appealability.

Dated:     December 13, 2022                              /s/ Jane M. Beckering
                                                          Jane M. Beckering
                                                          United States District Judge

53